# EXHIBIT 1

Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA AT CHARLESTON

JULIA WILLIAMS,

      Plaintiff,

v.            Civil Action No. 2:1-cv-4162

LOVED ONES IN HOME CARE, LLC
and DONNA SKEEN,

      Defendants.

_____

DEPOSITION OF JULIA WILLIAMS

_____

MONDAY, APRIL 16, 2018
2:05 P.M.

_____

LAW OFFICES OF LEWIS GLASSER, PLLC
BB&T SQUARE, SUITE 700
300 SUMMERS STREET
CHARLESTON, WEST VIRGINIA  25301

_____

Nancy Danesi Wolfe
Certified Court Reporter

GARRETT REPORTING SERVICE

POST OFFICE BOX 20200 . CHARLESTON WEST VIRGINIA 25362
(304)346-0460

WILLIAMS-4-16-18
April 16, 2018

Page 97

1      A    Yes.

2      Q    All right.  But, prior to that, your testimony

3   would be that only the two of you all rotated for call on

4   the weekend?

5      A    Yes.  Now, when I was in the Ripley office, I

6   did every weekend.

7      Q    Yes.  All right.  But I want to focus just on

8   the Charleston office.

9      A    Yes, me and Heather.

10     Q    Okay.  But that was it?  Nobody else

11  participated in that rotation.

12     A    I've gotten calls from Donna before on issues,

13  yes.

14     Q    Okay.

15     A    Now, could I tell you if she called in to the

16  office or they just called her?  I can't tell you that.

17     Q    Okay.  What did you do when you were calling

18  in on the weekends?

19     A    What would I do?

20     Q    Yeah.

21     A    Our first case, we start by 9 o'clock, so I

22  had to get up and call in to the office, to the answering

23  machine.  You had prompts you had to do.  I couldn't tell

24  you how to do it now.  But then there would be messages

WILLIAMS-4-16-18
April 16, 2018

Page 98

1    on the answering machine, and then I would jot it down.

2    I have client book of their plan of cares, a Waiver and

3    Personal Care.  I would have a phone list of the client

4    and the homemakers.  Most of the time once I called

5    client, they had my cell phone number.  I even got jumped

6    on for that.  But then I proceeded to call the client to

7    let them know that their caregiver called off, would they

8    like a caregiver.  If they said yes, then I'm on the

9    phone trying to replace that caregiver.  If the client

10   says no -- just like in a critical care case, bedfast, if

11   they say no, I call Heather and let them know, because

12   that lady is -- she's bedfast.

13        Q    All right.

14        A    She never did say she didn't want nobody.  She

15   always had to have somebody, but if I couldn't find

16   someone to cover it, Heather Finney-Smith knew about it.

17        Q    You would call her?

18        A    Correct.

19        Q    All right.  So every other weekend, how long

20   did you spend making those phone calls?  You said you

21   called the phone --

22        A    The first thing in the morning.

23        Q    At about 9?

24        A    Then you dealt with whatever it was.

WILLIAMS-4-16-18
April 16, 2018

Page 99

1    Q    All right.  And was there always something to

2    deal with?

3    A    Most of the time, yes.

4    Q    Okay.

5    A    I couldn't recall how many times there wasn't,

6    but yes.

7    Q    Okay.

8    A    And then every four hours up until our last

9    client which was staffed at 5 p.m.

10   Q    So you would call --

11   A    On one -- there was some that had up to 9

12   o'clock at night.  The latest that our caregivers could

13   be in a home is at 9 at night.

14   Q    Okay.  So starting at 9 in the morning you

15   would call every four hours --

16   A    Yes.

17   Q    -- up until 9 at night?

18   A    Correct.

19   Q    All right.  You have produced through your

20   attorney phone records.

21   A    Correct.

22   Q    All right.  And these correlate to your claim.

23   Correct?

24   A    Correct.

WILLIAMS-4-16-18
April 16, 2018

Page 100

1     Q    I'm not going to make them an exhibit.  This

2     is double-sided.  It's a lot of pages.

3     A    Yes.

4     Q    All right.  Have you been through these phone

5     records?

6     A    No, I have not.

7     Q    Okay.  Can you explain to me how you're basing

8     your claim in this case on these phone records?

9     A    Because I called from my cell phone.

10    Q    Okay.

11    A    And the records will show the number on there,

12    and numbers in between the time that I called, and I

13    still know the number.  It's 304-744-4081.

14    Q    That's the office?

15    A    South Charleston's office number.

16    Q    All right.  Other than looking for that phone

17    number, what other phone numbers would we look at to

18    determine what you did on a given weekend?

19    A    That I couldn't tell you without looking at

20    it.  And if they would provide a list of caregivers'

21    phone numbers --

22    Q    Do you have a list of the caregiver phone

23    numbers?

24    A    No, I do not.

WILLIAMS-4-16-18
April 16, 2018

Page 101

1      Q    All right.  How much time do you think you

2   spent on the average weekend while you were doing this?

3      A    8 to 10 hours, 10 to 12 hours.  I'm not for

4   sure.  It's not only -- you had Friday night.  You had

5   Saturday up until -- you had Friday night because you got

6   off at 4:30, so I had call until 9 o'clock that night.

7      Q    Yes.

8      A    Then I had to call on Saturday and then the

9   same thing Sunday up to 9 o'clock Sunday night, and then

10   once I got to the office, that's when we would check the

11   machine after that.

12      Q    All right.  So you're claiming that you worked

13   on a given Saturday 8 hours?  That's what your testimony

14   is?

15      A    No.

16         MR. TOOR:  That wasn't her testimony.

17         MR. ARCENEAUX:  Okay.  That's what I'm

18   asking her.

19         THE WITNESS:  No.  What I'm saying is

20   between Friday evening and Sunday night, anywhere from 10

21   to 12 hours.

22      BY MR. ARCENEAUX:

23      Q    Okay.  But what I'm asking you is how much

24   time of that period of time do you think you were

WILLIAMS-4-16-18
April 16, 2018

Page 102

1    working?

2            MR. TOOR:  She just testified.

3            THE WITNESS:  10 to 12 hours --

4            MR. ARCENEAUX:  Okay.

5            THE WITNESS:  -- from the period of Friday

6    night to Sunday night.

7        BY MR. ARCENEAUX:

8        Q    Well, you only called in every four hours.

9    Correct?

10       A    That's correct.

11       Q    All right.  Are you claiming that you were

12   working for the four hours between that you weren't

13   calling?

14       A    No.  What I'm claiming is when I did call in

15   and took the time, and if I had to deal with something, I

16   can't sit here and tell you it took me five minutes.  It

17   could take me an hour to find a caregiver, to call a

18   caregiver and leave a message I couldn't get a hold of,

19   for her to call me back and say, "Yes, I can go in."

20   Then I'm calling the client to let the client know that

21   she'd be there, and she only can work two hours.  Then

22   I'm finding another caregiver to go in for the other two

23   hours.  That's what I'm telling you.

24       Q    Okay.  Let me ask you this.  How can I use

WILLIAMS-4-16-18
April 16, 2018

Page 103

1    those phone records?

2        A    That's not for me to answer.  That's up to

3    you --

4        Q    Okay.

5        A    -- to determine.

6        Q    Well, do you intend -- I want to ask you a

7    hypothetical question.

8        A    Okay.

9        Q    Assume I am your lawyer.

10       A    Okay.

11       Q    We're in court --

12       A    Okay.

13       Q    -- and I'm going to hand you these phone

14   records and say, "What is your testimony based on these

15   phone records?"  What evidence do you intend to offer

16   based on those phone records?

17            MR. TOOR:  I'll answer the question

18   because it's a legal question, Jay.

19            THE WITNESS:  Okay.

20            MR. ARCENEAUX:  Wait a minute.  I'm asking

21   a factual question.  I don't want your answer.  I'm

22   wanting to depose this witness.

23            MR. TOOR:  And you're asking her how she

24   intends to use these records that I produced in response

WILLIAMS-4-16-18
April 16, 2018

Page 106

1    from having looked at them, what you concluded?

2       A    That I worked.

3       Q    Okay.  Can you step me through?  Did you look

4    at the first page?

5       A    No.

6       Q    All right.  What did you look at?

7       A    Here's what I'm going to say.  I don't have to

8    look through it.  I know I done it.  I guarantee if you

9    went through there, you would see the numbers.  I know.

10      Q    What numbers?  That's all I need to know.

11      A    304-744-4081 and, like I said, numbers that

12   they -- You could provide -- your client could provide

13   you with the client and homemakers that corresponds in

14   between each and every time I called the 744 number.

15   That's all I could testify to.

16      Q    Let me ask you this.  Was this your personal

17   cell phone?

18      A    Yes.

19      Q    All right.  So can I assume that you might

20   have made personal phone calls during that day, as well?

21      A    Yes.

22      Q    Okay.  So not every number listed there --

23      A    There again, you're correct, but your client

24   has numbers.

WILLIAMS-4-16-18
April 16, 2018

Page 107

1    Q    Okay.  Do you know other numbers that you

2    commonly dialed?  Would you have been calling relatives,

3    your children?

4    A    I have contacts on my phone.  Them number

5    would show, yes.

6    Q    All right.  Can I look at that and know when

7    those are contacts and when it's to a family member?

8         MR. TOOR:  We have no idea if you can do

9    that, Jay.

10        THE WITNESS:  No.

11        MR. TOOR:  Don't answer that question.  We

12   have no idea if you can do that.

13        MR. ARCENEAUX:  You don't have any right

14   to instruct her not to answer that question.  This is a

15   discovery deposition.  I'm allowed to ask her questions.

16        MR. TOOR:  I didn't want her to answer

17   until I finish my objection.  That's why I was

18   instructing her not to answer it yet.  Go ahead and ask

19   it again.  I'll see if I can get the objection in on time

20   this time to satisfy you.

21   BY MR. ARCENEAUX:

22   Q    Do you have a list of family members' phone

23   numbers that we could utilize to eliminate the family

24   members from this phone record?

WILLIAMS-4-16-18
April 16, 2018

1          MR. TOOR:  I'm going to object.  That's

2     outside the scope of discovery.

3          MR. ARCENEAUX:  She's offered this piece

4     of evidence, and it has thousands of phone numbers.

5          MR. TOOR:  Like I said, not our problem,

6     Jay.

7          MR. ARCENEAUX:  Well, I want to know what

8     she is going to offer with regard to testimony based on

9     this phone record.

10          MR. TOOR:  We don't intend to proffer any

11     testimony based on these phone records.

12          MR. ARCENEAUX:  All right.  So will you

13     stipulate that you do not intend to introduce these phone

14     records at the trial of this case?

15          MR. TOOR:  No, I'm not going to stipulate

16     to that.  I don't intend to do it in my case-in-chief.  I

17     don't need to do it in my case-in-chief.  I have no idea

18     what you're going to do, and I may need to do it in

19     rebuttal.  I'm not going to stipulate to that now.

20          MR. ARCENEAUX:  Will you stipulate that

21     you're not going to do it in your case-in-chief?

22          MR. TOOR:  No.  I don't know what else

23     your client intends to produce.  I'm looking at a

24     document from May 17, 2014, which was a Saturday.  There

WILLIAMS-4-16-18
April 16, 2018

Page 132

1    to two hours or if she's making a claim that that's what

2    she worked.

3              MR. ARCENEAUX:  All right.  Let me insert

4    the word "average," "on average."

5        BY MR. ARCENEAUX:

6        Q    Are you claiming that you worked on average

7    one to two hours beyond an eight-hour day each weekday?

8        A    No.

9        Q    Okay.  What are claiming that you worked on

10   average overtime for each weekday?

11       A    There again, I can't tell you.  It goes back

12   to what we talked about before.  It could be one hour

13   this day, nothing this day, all hell breaks loose this

14   day.  I can't sit here and tell you if it was one to two

15   hours every day.

16       Q    All right.

17       A    I could tell you at least one to two hours per

18   week, Monday through Friday.

19       Q    Okay.  Now, this then says eight to ten hours

20   of actually working time on alternate weekends when you

21   would be on call.

22       A    Correct.

23       Q    That's a correct statement in your opinion?

24       A    Correct.